> Wickliffe
> vs
> Bascom, &c.

---

## Wickliffe vs Bascom and others.

CHANCERY.

APPEAL FROM THE BATH CIRCUIT.

*Case* 161.

*Towns. Executions. Sheriffs.*

CHIEF JUSTICE MARSHALL delivered the opinion of the Court.

> October 9.

IN 1811, the town of Owingsville, in Bath county, was established on the lands of Thomas D. Owings and R. Menifee, and on their motion, by order of the County Court of said county, bonds were executed as required by the act of 1796. The order states that due advertise-

> The establishment of the town of Owingsville recognized.

WICKLIFFE
vs
BASCOM, &c.

ment was proved, and a plan of the proposed town returned and ordered to be recorded. Trustees were also named in the order, which was properly made under the statute. The town has existed in fact, to this time, and is and has been the seat of justice of Bath county. There has been, of course, a succession of trustees, more or less regular, to the present time, and every reasonable presumption will be indulged in favor of the sufficiency of the proceedings by which the town was originally established.

It appears that 168¼ acres of the land condemned for the town, was claimed by Owings, who afterwards received a conveyance of the tract of 2,908 acres, which includes the 168¼ acres on which it was established, and no one seems to have asserted an opposing claim to the 168¼ acres. It also appears that the trustees had not laid off into lots and sold more than 30 or 40 acres of the 168½, until the year 1836; when under two decrees of the Bath Circuit Court, directing a sale by the trustees, if they should think it proper to make sale, and if not, by a commissioner, of so much of the unsold part of the town as might be sufficient to satisfy the demands set up by the complainants against Owings, as evidenced by judgments and executions thereon returned, "no property," the trustees proceeded to sell the residue, or a large part thereof, in lots, taking bonds payable to the attaching complainants. Upon the return of their report of sales, the Court decreed that deeds should be made and possession delivered to the purchasers, which was done.

The present bill was filed in 1837, by Wickliffe, claiming that he and those under whom he claims, were, before the bills in the cases above referred to took effect as attachments, invested with whatever interest Owings had in the unsold portion of the 168¼ acres, and impeaching the decree and sale as erroneous and fraudulent. The trustees of the town, the complainants in the two suits, Bascom and others who had purchased the lots at the sale, and also various persons under whom Wickliffe claimed an interest in the title of Owings, were made parties, and the bill prayed for special and general relief. Upon the hearing the bill was dismissed; and the case has

Decrees against Owings for sale of part of the town lots by the trustees, their sale, &c.

The statement of Wickliffe's bill filed in 1837.

been brought to this Court on a record of more than 900 pages, consisting, in addition to the pleadings, almost entirely of the documents of title and the judicial proceedings under which Wickliffe claims.

Among the documents of title relied on by Wickliffe, are an article of compromise between himself and Bascom, dated two days after the sale of the lots under the decree, and a deed from Bascom to Wickliffe, made about one year later, in execution of the compromise, and after Bascom and other purchasers had been invested with the title to the lots. In both of these instruments Bascom acts not only for himself but also as the attorney in fact of Thomas D. Owings, both in his own right and as administrator with the will annexed, of T. J. Owings, deceased; and the deed purports to convey several tracts of land or the grantor's interest therein. One question greatly litigated in the case is, whether this compromise and deed transferred the interest of Bascom in the lots sold under the decrees. But we deem it unnecessary to decide this question, for so far as Wickliffe claims under Bascom he cannot impeach the decree which is the foundation of Bascom's title; and his claim being founded on a deed from Bascom, who had the legal title by conveyance from the trustees of Owingsville, his remedy at law is complete, if the deed covers the lots, and if it does not, he has no right under Bascom, for the deed is certainly as extensive as the compromise. And although the Circuit Court seems to have been of opinion that the deed does not embrace these lots, and to have dismissed the bill on that ground, at least in part, yet as there is no decree for altering the terms or effect of the deed, and as the reason which we have already given was a sufficient and proper ground for dismissing the bill so far as Bascom was concerned, the reason given by the Court below whether right or wrong, is not conclusive, and does not require revision by this Court in the present case. The dismissal of the bill is not a bar to the legal remedy upon the deed, if there be one, because the Court had no jurisdiction to give Wickliffe relief upon the deed, and any other reason given is not conclusive.

WICKLIFFE
*vs*
BASCOM, &c.

If the decision of the Circuit Court be right, this Court will not reverse, though the reason given by the Circuit Court may be wrong.

WICKLIFFE
*vs*
BASCOM, &c.

One acquiring title under a party to a suit, is bound by a decree made in that suit.

As T. D. Owings, whose interest Wickliffe also claims by the same deed, was a party to the suit and decrees, Wickliffe, if he acquired any interest from him in the subject of the suit, was bound by the decrees as fully as Owings himself was. But as whatever interest Owings had either in the lots or their proceeds, was completely divested by the decree and sale and delivery of possession, we do not perceive that Wickliffe acquired or could acquire, any interest in the subject of the suit, from T. D. Owings, by a deed conveying as this does, among other tracts, the tract of 2,908 acres described as patented to G. N. and conveyed to Owings, though with the additional words, "it being the tract of land including the town of Owingsville." Owings had not, either at the date of the deed or of the compromise, any interest in the lots or their proceeds, which could pass by this conveyance. No reference is made in the deed to any such interest, and Wickliffe did not acquire by it the right to prosecute either a writ of error or a bill of review in the name of Owings, and much less a right in his own name, to claim the lots or their proceeds. The same deed also professes to convey the interest of T. J. Owings in the tract of 2,908 acres, described as above. Whatever interest T. J. Owings had was acquired under executions against T. D. Owings, in virtue of which his title in the tract of 2,908 acres had been sold before the attachment bills took effect. But the question is whether any interest in the lots or land now in question, passed under the execution sale at which T. J. Owings purchased; and as we perceive nothing which can give to this purchase any more direct bearing on the town or greater effect in passing any land or interest in the town than the other execution purchasers under which Wickliffe claims should have, we shall consider the question of the interest acquired under these sales under one view.

In addition to the claim under the purchase of T. J. Owings, Wickliffe claims the interest acquired by Luke Tiernan, who purchased in 1827, under his own execution, and that of Comegys & Preshons against T. D. Owings, &c., and the interest acquired by Ellicott and Meredith, who purchased under the execution of Smith

against Owings, &c. in 1829, and also any interest which James Suddith may have acquired by a purchase of the right to redeem the tract of 2,908 acres within twelve months from the purchase of T. J. Owings or of others. But as this right of redemption was never exercised, that interest had ceased absolutely, long before Wickliffe obtained a deed from Suddith. These levies and sales were made in general terms, designating the subject of the levy as the tract or as the estate or right, title and interest of Owings in the tract of 2,908 acres, which in the case of Tiernan's purchase and that of Ellicott and Meredith, was further described as having been patented to George Nicholas, and conveyed by, &c. to T. D. Owings, with the additional words, "being the tract including the town of Owingsville." It does not appear that in any of these cases there was either in the levy or sale or deed to the purchaser, a particular designation of any interest in the town of Owingsville, or in any lots or parcels of land therein. Nor does it appear that Owings surrendered any such interest to these executions or any of them, or that he made any surrender by which the levies might be understood to embrace any interest which they would not otherwise reach. There was in fact, no reference to the town of Owingsville, in any of these levies, sales or deeds except in describing the tract levied on as being the tract including the town of Owingsville.

From this statement of facts, it is entirely clear: 1st. That unless Owings had an interest in this unsold part of the town, which was by law subject to levy and sale under execution as land or an interest in land, no interest whatever passed from him to the purchasers, in or to the said unsold part of the town, by virtue of any or all of these executions, levies, sales and deeds. And 2d. That if he had any such interest, the levies, sales and officer's deeds, making no reference thereto, but merely referring to his interest, that is, his legally vendible interest in the tract of 2,908 acres, described either by boundary or as patented, &c., and as being the tract including the town of Owingsville did not pass, and were not intended or understood to pass any such interest.

WICKLIFFE
vs
BASCOM, &c.

After a town has
been regularly
established, the
original proprie-
tor has not such
interest in the
lots as is the
subject of levy
and sale under
execution with-
out his consent-
The legal title
becomes vested
in the trustees of
the town.

The first of these propositions being too obvious to admit of question, the only enquiry under that proposition is, whether Owings had any such interest, and we proceed to enquire what interest he had or could have had in the unsold part of the town. By the legal establishment of the town, the title vested by law in the trustees to the extent of the boundary designated in the plan according to which it was established; and the subsequent conveyance to Owings from the representative of the patentee, if effectual, enured to the benefit of the trustees to the same extent. Owings as the proprietor who had established the town on his land, had no right against the trustees, except that of receiving the proceeds of sales of the lots, and the right of having timely and fair sales. The contingency of there being no sale of lots, and no town in fact, had not happened, and its consequences need not be considered. To the extent that lots had been sold by the trustees, there was no reversionary interest in Owings, even upon the unsupposable contingency of the cessation of the town. His title to that extent at least, had passed from him absolutely. And the purchasers having paid for and improved their lots, as part of the town established by law, to the extent of the designated boundary, and the title being in the trustees to that extent, for the purposes of a town, it is by no means certain that the original proprietor would be entitled, without the consent of these new proprietors, or at least of the trustees, to a resumption or reconveyance of any portion of the town tract, on the ground of its being unnecessary for the purposes of the town. If there be any such right, it is equitable only, and is a right to appeal to the sound discretion of the Chancellor for a restoration of the excess, on the ground that he had improvidently or in mistake, appropriated too much land for the town. Whether the Chancellor would have power to grant the relief desired, or to entertain the question, need not be considered, as the right of making the appeal to him, if an established one, would be purely equitable, and not a legal right subject to execution. The right to appeal to the trustees themselves for their consent, or for a conveyance, is of course not a legal title in the land.

And the right to demand and receive from them the proceeds of sale of lots has been determined not to be of that nature, and is certainly not liable to seizure and sale as an interest in land.

But it is urged that Owings was in possession of this unsold part of the town, and that this possession was itself a legal interest subject to levy and sale. If this be so, and if the possession were in fact levied on and sold, it certainly never was delivered under such sale, but was absolutely terminated by delivery to the purchasers from the trustees under the decrees before mentioned. And being moreover a possession presumably held under them and by their sufferance, it could have presented no obstacle to any sale by them in their character as trustees, whether held by Owings himself or by one claiming under him. It is not shown that there was any adverse possession by which a title was acquired as against the trustees. And an actual levy and sale and delivery of such possession as there was, would not if made, have given to the purchaser any right to question the decree or the actings of the trustees under it. But this point is immaterial, as Owings, who remained in possession, was a party to the decrees, and the possession was actually transferred in obedience to them. Without pushing this enquiry further, we are entirely satisfied that Owings had at most nothing more than a bare possession by sufferance, of this unsold part of the town, with the right to the proceeds of its sale whenever sold by the trustees, and with some undefinable right of having this unsold land, or some portion of it, relieved from his appropriation of it as a part of the town, and that none of these rights were subject to seizure and sale under the execution, unless the bare possession might be. And as this possession whether levied on and sold or not, remained in Owings until transferred under the decrees, it is clear that if any interest in this part of the town was acquired under these execution sales, being absolutely subject to the decrees, it ceased with the sale and delivery of possession made under them, and certainly is unavailable to Wickliffe as the vendee from the purchasers.

This conclusion would render the second proposition above stated in reference to these execution sales, of no consequence in the case, were it not that the transactions and documents by which Wickliffe claims title or interest from other sources, being founded on and plainly referring to the execution sales, which have been considered, it becomes necessary to ascertain with reference to this unsold part of the town, the extent of those sales as made, or intended or understood to have been made, in order to ascertain whether Wickliffe has acquired any interest in this part of the town from these other sources.

The possession, which, if subject to execution, was the only interest that was subject, did not pass, and could not have been understood to pass by the sales. This is demonstrated by the fact. Was it in fact levied on, or was any other interest of Owings within the town levied on, or supposed to have been levied on and sold? For the solution of these questions, the record furnishes no facts in addition to those already stated, except the prices bid at the several sales, and in some instances, the valuation by valuers of the land or interest levied on. The valuation, however, is not more specific in designating the particular subject, than the levies as returned by the officer, and the prices bid fall far below the valuations. The question is to be determined by construction of the language of the returns, in reference to the duties of the officer and the nature of the subject, or interest as to which the question is made.

It was probably uncertain what interest Owings had in the tract of 2,908 acres. The title to the town, however, had passed from him by public and notorious act. The reference to the town in describing the tract, shows that it was known to the officer. This reference was made to identify the tract as being the one which includes the town, and not to indicate that the town itself was intended to be levied on and sold. It is the duty of an officer levying an execution, to designate as far as may be, the nature of the interest to be sold, and if there be several adjoining parcels held by the same debtor, which might as to their extent, be described by one boundary, still if there be a substantial difference in the interest which he

It is the duty of an officer levying on land to designate the nature of the right which he has levied upon, and which he offers for sale: (8 *Dana*, 199.)

has in each, as if he be mortgagor of one, tenant in com-mon of another, and tenant for life of the third, it is the duty of the officer to make the proper discrimination and not by a sale *en masse,* to sacrifice the whole: *Daugherty vs Lynthicum,* (8 *Dana,* 199.) In regard to town prop-erty, the law and usage has established the practice of selling lots separately, and they are usually sold and con-veyed by number. To this practice the record before us shows that the officer who levied most of these executions had conformed, in regard to lots in the same town, sold under executions between the same parties, and in which as may be presumed, Owings had an interest certainly subject to execution. Whether he had any such interest in the unsold part of the town, was, as has been seen, extremely uncertain. And if he had, this interest was of a peculiar nature, requiring discrimination, if the officer intended to sell it as well as the interest in the tract outside of the town. The levy and sale as made, not only makes no such discrimination, but having been made in general terms, referring to the town only as des-criptive of the tract, they furnish no presumption that the officer intended to sell any interest in the town. There is, indeed, no presumption that knowing the title to the 168¼ acres hed been vested in the trustees, and that the interior portion of the larger tract had been condemned and appropriated as a town, he supposed Owings had any interest in the unsold portion, which could be levied on and sold. And as the presumption is, that if he had sup-posed there was such an interest, and had intended to levy on and sell it, he would have designated it at least so far as to call it the interest of Owings in the unsold part of Owingsville, the fair inference from all these con-siderations is, that he neither intended to levy on such interest nor was understood by himself or others to have done it. It might be assumed that ordinary bidders, though standing in the midst of the town and bidding for a large tract, or for the interest of Owings in a large tract, described as being the tract which included the town, but without reference to any interest in the town, would not have supposed that the officer was selling the town or any part of it. Such sales in mass, under vague and general

WICKLIFFE
vs
BASCOM, &c.

terms, are, when made by public officers under execution, contrary to the objects of the law, and when sustainable at all, should rather be restricted to their narrowest than extended to their broadest import. At any rate they should receive such reasonable construction and effect as would most probably comport with the intention of those concerned, and with the understanding of the parties and of the public at the time. The remaining source of title or claim arose in the following manner:

It appears that in 1824, Owings conveyed to six persons, who were bound for him in various debts, a large property in trust or mortgage for their indemnity. The deed conveys several tracts by description, and also a house and lot in Mountsterling, "and all other lands and lots held or claimed, in law or in equity, by the said Owings in the State of Kentucky." A large portion of the lands conveyed by this deed having been purchased by Tiernan under his executions, and the judgment of Smith for more than $25,000, for which some of the mortgagees were bound, being still unsatisfied, Wickliffe, the attorney of Tiernan and also of Ellicott and Meredith, who as trustees of Smith, had control of his judgment, having caused the execution on it to be levied on the lands purchased by Tiernan, made an arrangement of compromise with the mortgagees, by which Wickliffe, for Ellicott and Meredith, was to purchase under Smith's executions, all of the land which Tiernan had bought, (on which Smith's executions had been levied,) and was to bid therefor the whole amount of Smith's executions; in consideration of which the mortgagees were to pay $10,500 to Tiernan, in effect to quiet or remove his title, and were also to release to Ellicott and Meredith to the extent of the lands above referred to; and other persons, among whom was J. Suddith, who had also purchased some of the same lands, were in like manner to release to Ellicott and Meredith. It has already been seen that the unsold part of the town of Owingsville was not levied on under any of these executions; and the sales having been made under Smith's executions, and Wickliffe having, as agreed on, bid for and purchased the lands, and the officer having conveyed them to Ellicott and Meredith,

The levy of an execution upon a large tract of land of which part had been laid off into town lots and vested in trustees, and describing the land, and selling it as the tract upon which the town is established, or as including the town, does not import a sale of the proprietor's interest in the town.

by deed describing the tract of 2,908 acres, in the manner already commented on, the mortgagees of Owings, in November 1829, only a few weeks after the date of the compromise, released and conveyed their interest as they had agreed to do. This deed recites the levy of Smith's executions and the purchase by Ellicott and Meredith, and the conveyance to them by the officer, of various tracts of land, and among them the tract of 2,908 acres, described as in the officer's deed, and as before stated, and reciting that they had agreed to terms of compromise, and that Wickliffe, as agent for Ellicott and Meredith, had agreed to bid for and receive the above described tracts of land in full discharge and satisfaction of the debt of Smith; it goes on in consideration of the premises, and particularly in consideration of the party of the second part receiving this release and the lands above described, in full discharge, &c., and in consideration of one dollar, &c., to grant, bargain, sell, release and convey all the right, title, interest, claim and demand which they, the mortgagees, have in and to the above described lands and premises, as derived under the mortgage or under the purchase of any person in trust for them, &c. They also agree to warrant the title so far as the same is vested in them as above described, as the true intent and meaning of this conveyance is for the party of the first part to release to the party, &c., all the right which they have as above described, in the said property.

However extensive may have been the scope and efficacy of the deed from Owings to his mortgagees in investing them with all the rights, legal or equitable, which he might then have had within the town of Owingsville or within the 168½ acres of land, we are of opinion that the release or conveyance from said mortgagees to Ellicott and Meredith, is not more extensive than the purchases of Tiernan, and at any rate, not more extensive than the purchases under the executions of Smith, as provided for by the agreement of compromise, and referred to expressly in this deed; and as the sales under those executions did not include any portion of the unsold land or lots in the town of Owingsville, which were afterwards sold under the decrees above referred to, it follows that

no such interest was conveyed by this deed, which is *not* only founded on the compromise and recites the purchases made in pursuance of it, but is evidently intended as a mere release of such title as the grantor had in and to the lands purchased by the grantees as described in the sales and deeds of the officer. Its terms import nothing more, and especially when construed as they should be, with reference to the recitals and consideration, which are stated for the purpose of showing the intent of the deed. There is nothing to show that the deed was intended or understood to go further. Then if the mortgagees might have complained of the decrees as having been rendered without making them parties, or of the sales as having been made unnecessarily, or at inadequate prices, or fraudulently, or of the proceeds having been decreed to others, and if they might, upon any of these grounds, have sought relief, still the interest, if they had any which might have been affected, remained in them so far as this deed was concerned, and not having been conveyed to Ellicott and Meredith, could not have passed to Wickliffe, as claiming from or through them. His bill to impeach the decrees and sales cannot, therefore, be maintained in virtue of any interest derived through them under this deed from the mortgagees of Owings. The decrees and conveyances by which Wickliffe has concentrated the titles of Tiernan and Smith, or Ellicott and Meredith in himself, have not and could not give greater extent or efficacy to those titles, or to the execution sales under which he claims. Whether the deed from Bascom is to be restrained in its construction and operation, so as to pass no interest in the town of Owingsville or the unsold part thereof, we need not, as already shown, decide in this case, as an affirmative conclusion would not authorize Wickliffe to impeach the decrees.

Wherefore, the decree is affirmed.

*Morehead & Reed and Loughborough* for appellant; *Apperson* for appellees.